**[ORAL ARGUMENT NOT YET SCHEDULED]**
**Nos. 12-5404, 12-5399, 12-5401**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**FADI AL-MAQALEH,** *et al.*,
**Petitioners-Appellants,**
v.
**BARACK OBAMA,** *et al.*,
**Respondents-Appellees.**

_____

**AMIN AL-BAKRI,** *et al.*,
**Petitioners-Appellants,**
v.
**BARACK OBAMA,** *et al.*,
**Respondents-Appellees.**

_____

**REDHA AL-NAJAR,** *et al.*,
**Petitioners-Appellants,**
v.
**BARACK OBAMA,** *et al.*,
**Respondents-Appellees.**

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

**JOINT BRIEF FOR PETITIONERS-APPELLANTS**

_____

TINA MONSHIPOUR FOSTER
Executive Director
GOLNAZ FAKHIMI
Staff Attorney
**International Justice Network**
5500 Ridge Rd West
Spencerport, NY 14559
(718) 717-8467
*Counsel for Petitioners-Appellants Fadi al-Maqaleh,*
*Amin al-Bakri and Redha al-Najar*

SYLVIA ROYCE
**Law Office of Sylvia Royce**
3509 Connecticut Ave, NW #1176
Washington, DC 20008
(202) 362-3445
*Counsel for Petitioner-Appellant Redha al-Najar*

PROF. RAMZI KASSEM
MARLOWE BOETTCHER*
ELIZABETH ROSSOW*
Main Street Legal Services, Inc.
**City University of New York School of Law**
2 Court Square
Long Island City, NY 11101
(718) 340-4558
*\*Law Student Interns*

PROF. HOPE METCALF
National Litigation Project
Lowenstein Int'l Human Rights Clinic
**Yale Law School**
127 Wall St
New Haven, CT 06511
(203) 432-0138
*Counsel for Petitioner-Appellant Amin al-Bakri*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**I.  Parties and Amici**

Petitioners-Appellants ("Petitioners") are detainee Fadi al-Maqaleh; Ahmad al-Maqaleh as Next Friend of Fadi al-Maqaleh; detainee Amin al-Bakri; Muhammad al-Bakri as Next Friend of Amin al-Bakri; detainee Redha al-Najar; and Houcine al-Najar as Next Friend of Redha al-Najar.

Respondents-Appellees ("Respondents") are Barack H. Obama, President of the United States; Chuck Hagel, Secretary of the Department of Defense; and John Does 1 and 2, as custodians of Petitioners.

Undersigned counsel are unaware of any current or anticipated amici in this matter.

**II. Rulings Under Review**

Petitioners appeal the October 19, 2012, Memorandum Opinion and Order of the district court, dismissing for lack of jurisdiction the amended petitions for writ of habeas corpus of Fadi al-Maqaleh, Amin al-Bakri, and Redha al-Najar.  *See Al-Maqaleh v. Obama*, ___ F. Supp. 2d ___, 2012, U.S. Dist. LEXIS 150446 (D.D.C. 2012).

**III.    Related Cases**

On February 21, 2013, this Court issued an order directing the clerk to calendar this case for oral argument on the same day and before the same panel as two other appeals before the Court arising from habeas petitions filed by prisoners in U.S. military custody at Bagram Air Base, Afghanistan: *Amanatullah v. Obama,* No. 12-5407, and *Hamidullah* v. *Obama*, No. 12-5410.  On March 12, 2013, the Court granted the Parties' Joint Motion for Extension of Time and Related Relief to Avoid Duplication and directed the parties in the instant matter, *Amanatullah*, and *Hamidullah* to file a single joint appendix.

Undersigned counsel are unaware of any other case involving substantially the same parties and the same or similar issues, pending before this or any other court.

Dated:  April 26, 2013

Respectfully submitted,


    /s/  Tina M. Foster
                Counsel for Appellants

# TABLE OF AUTHORITIES

**Constitutional Provisions**

*U.S. Const. art. I, 9………………………………………………………………….3

**Cases**

*Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004)………………………….42

*Campbell v. United States*, 365 U.S. 85 (1961)…………………………………..42

*Al Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2009)…………….3-5, 12, 14, 16, 19, 20, 30, 35, 36, 41, 42

*Almerfedi v. Obama*, 654 F.3d 1, 4 n.3 (D.C. Cir. 2011)……………………..29, 30

*Awad v. Obama*, 608 F.3d 1 (D.C. Cir. 2010)……………………………..29, 30

* *Boumediene v. Bush*, 553 U.S. 723 (2008)………………………….3, 20, 25-31

*Council for Urological Interests v. Sebelius*,
668 F.3d 704, 707 (D.C. Cir. 2011).......................................................................14

*El-Shifa Pharmaceutical Indus. v. United States*,
607 F.3d 836, 839 (D.C. Cir. 2010)…………………………………………….…15

*Jerome Stevens Pharmaceuticals, Inc. v. FDA*,
402 F.3d 1249 (D.C. Cir. 2005)…………………………………….............14, 35

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)…………………………....16, 19, 27

*Rasul v. Bush*, 542 U.S. 466 (2004)……………………………………….26, 44, 45

**Statutes**

28 U.S.C. §1331…………………………………………………………………3

28 U.S.C. §§ 2241-42……………………………………………………………3

**Rules and Regulations**

Fed. R. Civ. P. 12(b)(1)…………………………………………………………...15

 * Authorities upon which we chiefly rely are marked with asterisks.

TABLE OF CONTENTS

GLOSSARY……………………………………………………………..1
STATEMENT OF JURISDICTION…..…………………………………….3
STATEMENT OF THE ISSUE ……………………………………………3
STATEMENT OF THE CASE…………………………………………4
STATEMENT OF THE FACTS………………………………………...5
A.     Petitioners………………………………………………………5
1.     Fadi al-Maqaleh…………………………………………………..6
2.     Amin al-Bakri……………………………………………………6
3.     Redha al-Najar……………………………………………………7
B.     New Factual Allegations in the Amended Petitions………………..........8
1. Criminal Trials and Appellate Proceedings at Bagram are Now Routine…......8
2. Respondents Play a Significant Role in the Prosecution of Criminal Cases of
Afghan Detainees at Bagram……………………………………………8
3.     The Government of Afghanistan Favors this Court's Exercise of Habeas
Jurisdiction in these Cases…………………………………………………9
4. The DRBs Have Cleared Petitioners for Release from Bagram………………10
5. Petitioners DRBs Were Procedurally Inadequate……………………………..10
6. Respondents Plan to Detain Petitioners Indefinitely at a New Facility at Bagram
That Will Not Be Transferred to the Afghan Government..………………………11
7. Respondents Initially Sent Petitioners to Bagram, and Continue to Detain Them
There, In Order to Evade Judicial Review…………………………………………11
SUMMARY OF ARGUMENT ………………………………………………12
STANDARD OF REVIEW……………………………………………………14
ARGUMENT…………………………………………………………………15
I.     The District Court Erred by Ignoring Petitioners' New Evidence on the
Practical Obstacles Factor of the Jurisdictional Analysis………………………..15
A.     The District Court Improperly Treated The Practical Obstacles Factor as a
"Trump Card" in the Jurisdictional Analysis…………………………………15
B. The District Court Ignored Petitioners Evidence of Criminal Trials at Bagram
and the Significant Role of Respondents in Those Trials…………………………17
C.     The District Court's Factual Findings Concerning Bilateral Relations Were
Erroneous……………………………………………………………………20
II.     The Citizenship, Status, and Adequacy of Process Prong of the Boumediene
Analysis Now Weighs Decisively in Petitioners' Favor……………………..…..25
A.     Petitioners' Status Now Weighs Even More Heavily in their Favor………27
B.     The Adequacy of Process Factor Still Weighs Heavily in Petitioners' Favor
     …………………………………………………………………………...30

1.      The DRB Procedures Still Fall Short of the CSRTs That Were Deemed
Inadequate in Boumediene……………………………………………………….30
2.      Petitioners' DRBs Were Procedurally Inadequate…….……………………33
III.    The Nature of the Site of Detention Now Weighs in Favor of Petitioners...35
A.      The District Court Erred in Relying on Respondents' Unsupported
Representations that the US Does Not Intend to Create a Permanent Detention
Facility at Bagram…………………………………………………………………..35
B.      A Feature of the Site of Detention Which is Unique to the Bagram and
Guantanamo Military Bases Is that Detainees Are Held Pursuant to the AUMF,
Rather than the Laws of War………………………………………………………..39
IV.     The District Court Erroneously Concluded that Petitioners Evidence of
Evasion Was Irrelevant…………………………………………………………40
CONCLUSION………………………………………………………………..46
CERTIFICATE OF COMPLIANCE…………………………………………..48
CERTIFICATE OF SERVICE ……………………………………………….49

# GLOSSARY

ARB – Administrative Review Board

AUMF – Authorization for Use of Military Force

Bagram Air Base – Largest U.S. Air Base in Afghanistan, located 40 miles north of Kabul

Bagram – U.S. detention facilities on Bagram Air Base

CIA – U.S. Central Intelligence Agency

CSRT – Combatant Status Review Tribunal

DFIP – Detention Facility in Parwan, located on Bagram Air Base

DTA – Detainee Treatment Act of 2005

DRB – Detainee Review Board

Guantánamo – U.S. detention facilities in the U.S. Naval Station at Guantánamo Bay, Cuba

ICRC – International Committee of the Red Cross

ISAF – International Security Assistance Force of North Atlantic Treaty Organization

JCIP – Justice Center in Parwan, location of trial and appellate courts on the Bagram Air Base

MCA – Military Commissions Act of 2006

MOU – Memorandum of Understanding between the Islamic Republic of Afghanistan and the United States of America On Transfer of U.S. Detention Facilities in Afghan Territory to Afghanistan (dated Mar. 9, 2012)

PR – Personal Representative

1

TCN – Third Country National

UECRB -- Unlawful Enemy Combatant Review Board

## STATEMENT OF JURISDICTION

This Court has jurisdiction over the instant matter pursuant to 28 U.S.C. § 1291. The district court below dismissed petitioners' amended petitions for lack of subject matter jurisdiction on October 19, 2012. *Al-Maqaleh v. Obama*, ___ F. Supp. 2d ___, 2012, U.S. Dist. LEXIS 150446 (D.D.C. 2012). Petitioners filed a timely notice of appeal on December 17, 2012.

Petitioners assert that the district court below had subject matter jurisdiction over their amended petitions, brought through their Next Friends, pursuant to 28 U.S.C. §§ 2241-42 and the Suspension Clause, U.S. Const. art. I, §9, as interpreted by the Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008). In their amended petitions, petitioners also invoked federal question jurisdiction pursuant to 28 U.S.C. §1331.

## STATEMENT OF THE ISSUE

The issue presented in this appeal is whether the district court erred in holding that it lacked subject matter jurisdiction over the habeas corpus petitions of three foreign nationals rendered from third countries to indefinite U.S. military custody at Bagram for more than 8 years. The district court held that in light of this Court's opinion in *Al Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010) ("*Maqaleh II*"), petitioners were not entitled to invoke the district court's habeas jurisdiction. *Al Maqaleh v. Obama*, ___ F. Supp. 2d ___, 2012, U.S. Dist. LEXIS

3

150446 (D.D.C. 2012) ("*Maqaleh III*"). Petitioners respectfully submit that the district court erred, because its analysis was inconsistent with the jurisdictional test set forth in *Boumediene* and applied in *Maqaleh II*. Accordingly, Petitioners request that this Court reverse the decision in *Maqaleh III*, and remand the cases to the district court for further proceedings.

## STATEMENT OF THE CASE

Between 2006 and 2008, each of the three detained petitioners in the instant appeal, acting through their Next Friends, filed a petition seeking a writ of habeas corpus in the district court. Respondents moved to dismiss each of the petitions for lack of subject matter jurisdiction, and the cases were consolidated for argument on the motion. In applying the Supreme Court's decision in *Boumediene*, the district court originally denied respondents' motion, and held that petitioners were entitled to invoke the court's habeas jurisdiction. *Al Maqaleh v. Gates*, 604 F. Supp. 2d 205 (D.D.C. 2009) ("*Maqaleh I*").

Though the district court held in favor of petitioners in *Maqaleh I*, it granted respondents' request for the case to be certified for interlocutory appeal. On appeal, this Court reversed the decision of the district court and dismissed the petitions for lack of subject matter jurisdiction. *Maqaleh II*, 605 F.3d at 99. Petitioners subsequently petitioned for panel rehearing on the basis of new, jurisdictionally-relevant evidence. This Court denied rehearing – stating, however,

4

that its denial was "without prejudice to [petitioners]' ability to present this evidence to the district court in the first instance." Per Curiam Order, *Al Maqaleh v. Obama*, No. 09-5265 (D.C. Cir. July 23, 2010).

Petitioners then filed a joint motion to amend their petitions, which the district court granted. Order, *Al Maqaleh v. Obama*, No. 06-1669 (D.D.C. Mar. 25, 2011), ECF No. 62. Petitioners filed their amended petitions on April 4, 2011. JA406; JA1028; JA1114. And, as before, Respondents moved to dismiss the petitions for lack of subject matter jurisdiction. This time the district court granted respondents' motion and dismissed petitioners' cases. *Maqaleh III*, U.S. Dist. LEXIS 150446. Petitioners now appeal the district court's decision in *Maqaleh III*.

## STATEMENT OF THE FACTS

### A.    Petitioners

Petitioners Fadi al-Maqaleh, Amin al-Bakri, and Redha al-Najar ("petitioners") are TCNs whom respondents have held at Bagram for nearly a decade, without charge or trial, in their indefinite and exclusive custody. Each petitioner is a civilian who has never been charged with a crime in any jurisdiction, was wrongfully seized from a third country by unknown agents, subsequently held and abusively interrogated at CIA black sites, and then unlawfully rendered to Afghanistan against his will. Today at Bagram there are approximately 50 TCNs

in respondents' custody.  JA690.  Presumably a tiny fraction of them were held at black sites and, like petitioners, forcibly rendered to Afghanistan by respondents.

**1.    Fadi al-Maqaleh**

Petitioner Fadi al-Maqaleh is a 31-year old Yemeni man who has been in U.S. military custody since he was at least 23 years old.  JA408 ¶¶11-13.  His father, Ahmed al-Maqaleh, serves as his Next Friend and filed a habeas petition on his behalf on September 28, 2006 (first amended on February 12, 2007).  In his original habeas petition, petitioner al-Maqaleh alleged that he was initially taken into U.S. custody somewhere outside of Afghanistan.  On April 4, 2011, petitioner al-Maqaleh filed a second amended petition, in which he alleged that he was held at Abu Ghraib, as well as black sites, prior to being transferred to Bagram.  JA406 ¶¶11-14.  Since 2007, respondents have disputed petitioner al-Maqaleh's allegation that he was initially captured outside of Afghanistan.  JA27 ¶20; *cf*. JA474 ¶¶13-14.  However, respondents have never disputed petitioner al-Maqaleh's 2011 allegations that he was detained in Iraq, and at black sites where he suffered torture and abusive interrogation, prior to being forcibly rendered to Bagram.

**2.    Amin al-Bakri**

Petitioner Amin al-Bakri is a 44-year old husband and father of three. JA1118 ¶13.  His father, Muhammad al-Bakri, serves as his Next Friend and filed the original habeas petition on his behalf on July 28, 2008, and later filed his

amended petition on April 4, 2011. JA1114. Petitioner al-Bakri is a Yemeni citizen and, prior to his seizure, was a successful businessman who sold and traded precious stones and marketed shrimp in several Southeast Asian countries. While on a routine business trip in Bangkok, Thailand, he was abducted by U.S. agents in December 2002. After he was seized, he was secretly transported to black sites where he suffered torture and abusive interrogation, prior to being forcibly rendered to Bagram. JA1118-19 ¶¶13-19. Respondents have never disputed any of these factual allegations.

**3.      Redha al-Najar**

Petitioner Redha al-Najar is a 47-year old Tunisian citizen. His brother, Houcine Al-Najar, serves as his Next Friend and filed a habeas petition on his behalf on December 10, 2008, and later an amended petition on April 4, 2011. JA1028. Both petitions allege that in approximately May 2002 he was abducted from his home in Karachi, Pakistan, in front of his wife and small child. JA1031-32 ¶¶12-15. Although respondents in 2008 conceded his seizure from Karachi, they now make no representation as to his place of capture. JA1020 ¶20; *cf*. JA475-76 ¶¶19-21. Nevertheless, petitioner al-Najar alleges that following his abduction from his home he was disappeared for one and a half years and tortured and abusively interrogated at one or more black sites, prior to being rendered to

7

Bagram JA1031-33 ¶¶12-17. Respondents have never disputed any of these allegations.

**B.    New Factual Allegations in the Amended Petitions**

In addition to the facts alleged above, petitioners' amended petitions filed on April 4, 2011, averred new, jurisdictionally-relevant facts that were not in the record in *Maqaleh II*. Under *Boumediene*, these new factual allegations, and the overwhelming evidence in support thereof, require habeas review for these petitioners.

**1. Criminal Trials and Appellate Proceedings at Bagram are Now Routine**

In their amended petitions, petitioners allege that criminal trials at Bagram began in June 2010 and have routinely taken place on the base since that time. Respondents have allowed U.S.-based media and monitoring groups onto the Airbase to observe these trials – which are full-fledged criminal proceedings under Afghan law. *See, e.g.*, JA441-43 ¶¶121-23.

Petitioners also submitted evidence that the newly built JCIP processed 672 cases during the first 2 years it was in operation, including primary court trials (of both adults and juveniles), as well as appellate proceedings. JA763-65.

**2. Respondents Play a Significant Role in the Prosecution of Criminal Cases of Afghan Detainees at Bagram**

U.S. Army personnel and/or U.S. contract personnel are providing the forensic evidence and reports which provide the basis for Afghan prosecutions at the JCIP. Respondents routinely conduct lab tests such as latent fingerprinting or firearms analysis, which are then turned into a report and translated into Dari for use at trial by their Afghan counterparts. Respondents are also engaged in the collection of evidence gathered at the scene of capture for use in prosecutions at the JCIP, including photos, weapons, fingerprints, electronics, and witness statements. JA773-76. Finally, U.S. Government officials provide mentoring, training, and assistance to Afghan judges, prosecutors, defense attorneys, and investigators at the JCIP. JA770-72. Respondents do not dispute any of these facts.

### 3.    The Government of Afghanistan Favors this Court's Exercise of Habeas Jurisdiction in these Cases

Since the filing of their amended petitions, Petitioners have submitted compelling evidence in support of their allegation that the Afghan government does not object to this Court's exercise of habeas jurisdiction over their cases. The record now reflects the definitive position of the Afghan government, which has issued written confirmation to Petitioners' counsel that it *favors* petitioners' access to judicial review of their detention by non-Afghan courts. JA898-99. Though Respondents urged the district court to disregard this evidence, they have never disputed the truth of what petitioners allege and have overwhelmingly

9

substantiated: that the Afghan government *favors* this Court's exercise of jurisdiction over petitioners' habeas cases.

### 4. The DRBs Have Cleared Petitioners for Release from Bagram

In 2009, Respondents issued new procedures for determining the status of Bagram detainees through so-called Detainee Review Boards ("DRBs"). JA483-91. In their petitions filed April 4, 2011, petitioners allege that that they have been reviewed by multiple DRBs (which occur every six months). *See, e.g.*, JA1114 ¶¶144-56. They also allege that at least one (and in some instances multiple) DRBs have determined them to be eligible for release from Bagram. *See, e.g.*, JA683. Nowhere in the record do Respondents dispute these allegations.

### 5. Petitioners DRBs Were Procedurally Inadequate

Respondents argue that the DRBs are an improvement over the UECRBs which were previously in place at Bagram because, at least on paper, they afford detainees the ability to call live witnesses, and provide the detainee with the assistance of a Personal Representative (PR) in order to assist him in doing so, among other things. Resp'ts' Mot. to Dismiss Am. Pets. for Writs of Habeas Corpus at 18-24, *Al Maqaleh v. Obama*, No. 06-1669 (D.D.C. May 19, 2011), ECF No. 64 ("Resp'ts' MTD"). However, Petitioners have submitted evidence that in practice, Respondents have arbitrarily denied them the ability to call available in-person witnesses, despite their PR's best efforts to assist them. *See* JA910 *et. seq.*

10

**6. Respondents Plan to Detain Petitioners Indefinitely at a New Facility at Bagram That Will Not Be Transferred to the Afghan Government.**

Respondents previously argued before this Court that they had no plans to occupy Bagram any longer than necessary to conduct on-going military operations in Afghanistan, and that they intended to transfer detention operations at Bagram to Afghan control as soon as practicable. Br. for Resp't-Appellants at 34, *Al Maqaleh v. Gates*, No. 09-5265 (D.C. Cir. Sep. 14, 2009), Doc. No. 1206197. However, since *Maqaleh II*, Petitioners have alleged that Respondents have built a separate prison facility at Bagram which Respondents do *not* intend to transfer to custody and control of the Government of Afghanistan. *See e.g.,* JA406 ¶¶111-120. Respondents have not disputed Petitioners' new allegations.

**7. Respondents Initially Sent Petitioners to Bagram, and Continue to Detain Them There, In Order to Evade Judicial Review**

Petitioners allege that Respondents chose Bagram as the site of their detention in order to evade judicial review. *See, e.g.,* JA1114 ¶¶89-109; *see also* Pet'rs' Opp'n to Resp'ts' Mot. to Dismiss at 28-33, *Al Maqaleh*, No. 06-1669 (D.D.C. June 24, 2011), ECF No. 65. They have also submitted overwhelming evidence that, at the time when Petitioners were first transferred to Bagram, evasion of judicial review informed Respondents transfer decisions as a matter of policy. *See, e.g.,* JA1114 ¶¶89-109; *see also* JA603-677. Respondents have neither confirmed nor denied whether their decisions to transfer Petitioners to

11

Bagram, or to continue to detain them there, were/are motivated by a desire to evade judicial review.

## SUMMARY OF ARGUMENT

The district court in *Maqaleh III* erred in granting Respondents' 12(b)(1) motion to dismiss by failing to accept as true Petitioners' undisputed factual allegations and ignoring the supplemental evidence in the record in support of those allegations.   The district court also misapplied this Court's decision in *Maqaleh II* by failing to re-balance the weight of each of the *Boumediene* factors in light of Petitioners' new allegations and evidence.  Instead, the district court treated each factor in the analysis as a pre-requisite to habeas jurisdiction, and thus improperly concluded that the practical obstacles factor effectively trumped all of the other factors which weighed decisively in petitioners' favor (i.e. status, adequacy of process, and site of detention).  *See* JA984.

With respect to the practical obstacles factor, the district court erred by failing to recognize that Petitioners' new evidence significantly undermined the concerns cited by the court in *Maqaleh II*, and should have afforded it less weight in the *Boumediene* analysis.  Instead, the district court examined the question of whether the practical obstacles factor *alone* weighed in favor of Petitioners, treating it as a threshold issue on which Petitioners must prevail in order to alter the jurisdictional analysis in *Maqaleh II*.  In *Maqaleh II*, the court held that the

12

practical obstacles were "overwhelmingly" in favor of respondents, citing specific concerns over the prison's location in a theatre of war, and the potential reaction of the Government of Afghanistan to the court's exercise of habeas jurisdiction over petitioners' claims. *Maqaleh II*, 605 F.3d at 97. But as petitioners' new allegations and evidence demonstrate, the practical obstacles cited by this Court in *Maqaleh II* are no longer relevant concerns. As the record now reflects, Bagram's location within a theatre of war has not prevented respondents from implementing countless criminal trials in civilian courts on Bagram Airbase. In addition, the Afghan government has confirmed that it does not object to Petitioners' invocation of the US courts' habeas jurisdiction. Indeed, Petitioners submit that on the basis of the new record now before the Court, the practical obstacles prong of the jurisdictional test now weighs in their favor. However, even if it didn't, the evidence concerning practical obstacles certainly is no longer "overwhelmingly" in favor of Respondents.

In addition to undermining the practical obstacles determination, Petitioners new allegations and evidence significantly strengthen their position on status and adequacy of process. The new record reflects that Petitioners have been cleared for release by DRBs, and thus the status factor weighs even *more* heavily in their favor than it did before. In addition, the process through which Petitioners' status

13

was determined is still woefully inadequate, not only on its face, but as applied to Petitioners in their more recent DRBs.

Finally, the district court erred by failing to credit as true Petitioners' uncontested allegations that they were rendered to Bagram so that Respondents could evade judicial review of the legality of their detention. In doing so, the court improperly failed to consider the impact of such deliberate manipulation of the site of Petitioners' detention by the Executive.

The new facts offered by Petitioners significantly alter the jurisdictional analysis set forth in *Maqaleh II* in their favor. In the absence of contrary evidence, the district court was required to credit Petitioners' allegations as true and draw all reasonable inferences in the plaintiff's favor. *Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). It failed to do so. Accordingly, this Court should reverse the decision in *Maqaleh III*, and remand these cases for further proceedings in the district court.

**STANDARD OF REVIEW**

This Court reviews a dismissal for lack of subject matter jurisdiction *de novo*. *E.g.*, *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 707 (D.C. Cir. 2011); *Maqaleh*, 605 F.3d at 94. In connection with that review, the Court

accepts petitioners' allegations as true.[1]  *El-Shifa Pharmaceutical Indus. v. United States*, 607 F.3d 836, 839 (D.C. Cir. 2010).

## ARGUMENT

**I.  The District Court Erred by Ignoring Petitioners' New Evidence on the Practical Obstacles Factor of the Jurisdictional Analysis.**

### A. **The District Court Improperly Treated The Practical Obstacles Factor as a "Trump Card" in the Jurisdictional Analysis.**

The district court stated that the practical obstacles prong of the *Boumediene* test was "the single most important factor in the analysis" of the Court of Appeals in *Maqaleh II*.  While it is true that this Court previously concluded that the evidence in the record before it demonstrated that the practical obstacles to extending the writ to Bagram weighed heavily in favor of Respondents, it does not follow that Petitioners must *prevail* on the practical obstacles factor in order to alter the outcome of the *Boumediene* analysis.  The *Boumediene* analysis is not a "checklist" that Petitioners must complete by persuading the Court that they "win" on each one of the factors.  It is a fluid analysis that weighs each factor in light of the others – and even if the Court concludes that the "practical obstacles" factor

---

[1] In the interest of avoiding duplication of arguments, Petitioners hereby incorporate by reference two lines of cases cited in the *Amanatullah* appellants' brief: cases regarding the appropriate evidentiary standard that the district court should have applied in considering Respondents' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) – and cases supporting the discretion of the district court to order discovery into disputed jurisdictional facts.

ultimately weighs in favor of Respondents, it must still consider the *degree* to which the evidence in support of that factor tips the scale in their favor.  On the record previously before it, this Court held that the evidence of practical obstacles to extending the writ to Bagram "weighs overwhelmingly" in favor of Respondents.  *Maqaleh II*, 605 F.3d at 97.  Petitioners submit that the record now reflects evidence that significantly undermines that conclusion.

The Court concluded that the practical obstacles to extending the writ to Bagram weighed very heavily in favor of Respondents based primarily on the prison's location within a theatre of war.  *Maqaleh II*, 605 F.3d at 97.  The Court's rationale for the distinction between Guantánamo and Bagram was based on language from *Eisentrager*, in which the Supreme Court expressed concern that "trials would hamper the war effort, and bring aid and comfort to the enemy."  339 U.S. at 779.

The Supreme Court expressed these concerns as part of its discussion of *logistical* obstacles to granting the writ to detainees on a far-away battlefield.  The paragraph in which this quote appears in *Eisentrager* begins with the sentence, "A basic consideration in habeas corpus practice is that the prisoner will be produced before the court."  339 U.S. 778.   The Supreme Court in *Eisentrager* first expressed concern that granting "the writ to these prisoners might mean that our army must transport them across the seas for hearing."  339 U.S. 779.  The Court

also mentioned logistical concerns, including "allocation of shipping space, guarding personnel, billeting, and rations." *Id*.

In *Maqaleh II*, Petitioners had argued that the logistical concerns discussed in *Eisentrager* have since been mitigated by technological advancements over the past 50 years and that making the writ available to Petitioners would not be anomalous in the post-*Boumediene* era. Jt. Br. for Pet'rs-Appellees at 37-38, *Al Maqaleh v. Gates*, No. 09-5265 (D.C. Cir. Nov. 4, 2009), Doc. No. 1214136

But the panel in *Maqaleh II* held that the practical obstacles factor weighed heavily in favor of Respondents, based on Respondents' representations that allowing Petitioners to avail themselves of the writ would be entirely "impracticable." Br. for Resp'ts-Appellants at 43, *Al Maqaleh v. Gates*, No. 09-5265 (D.C. Cir. Sep. 14, 2009), Doc. No. 1206197. At the time, no judicial proceedings of any kind had occurred at Bagram, and thus Respondents' arguments had far more weight then.

## B. The District Court Ignored Petitioners Evidence of Criminal Trials at Bagram and the Significant Role of Respondents in Those Trials

As the new record reflects, full-blown criminal trials in civilian courts are now routine occurrences at Bagram, though Petitioners have no hope of ever receiving such a process there. Apparently Respondents themselves have determined that threats from enemies have been sufficiently contained to permit countless full-blown criminal trials at Bagram. But Respondents would now have

17

it both ways, by simultaneously allowing criminal trials to proceed for almost all of the other detainees at Bagram, while preventing Petitioners from having the opportunity to seek judicial review in any forum based on practical concerns.

The first jointly run U.S.-Afghan judicial proceedings at Bagram occurred in June 2010. Between June 2010 and January 2011, 36 such proceedings occurred through "judges, prosecutors, and forensic experts[]mentored by Americans." *See* JA399. The District court held that this evidence was insignificant because Respondents' role in this handful of proceedings was limited to "'facilitating' the trials – by allowing detainees to appear for trial and mentoring the Afghan participants." JA980. But Petitioners submitted far more compelling evidence, which the District court ignored completely.

The full-blown criminal trials at Bagram were not limited to a handful of cases: they quickly became routine occurrences. By February 2011, over 50 trials had been completed at Bagram, and US-based media and monitoring groups were granted access to the base in order to view the proceedings. JA1114 ¶113. By the middle of 2012, Respondents had completed the construction of the JCIP, a massive judicial complex at Bagram which contains not only trial courts, but juvenile and appellate courts. "Compared to the previous reporting period, judicial capacity at the JCIP has improved significantly; since the first trial in June 2010 through March 2012…the JCIP has completed a total of 672 trials (439 primary

18

and 233 appellate court trials).”   JA764.  By December 2012, the number of JCIP

trials for 2012 alone totaled *1,135*.  *See* Capt. William Edge, *Rule of Law Makes*

*Impressive Gains at Justice Center in Parwan, Afghanistan*, Combined Joint

Interagency Task Force (CJIATF) 435, Dec. 4, 2012, *available at*

http://www.dvidshub.net/news/98704/rule-law-makes-impressive-gains-justice-

center-parwan-afghanistan#.URRnsIUhvgB.

    Petitioners further presented evidence that the role of U.S. military personnel

in such trials is not limited to “mentoring” Afghan judges, prosecutors and forensic

experts.  In fact, Department of Army and/or U.S. contract personnel *are*

*responsible for providing the forensic evidence and reports which provide the*

*basis for Afghan prosecutions at the JCIP*.  JA773.  Because Respondents now

routinely collect evidence gathered at the scene of capture in Afghanistan for use at

the JCIP – including photos, weapons, fingerprints, electronics, and witness

statements – it can no longer be said that their “efforts and attention from the

military offensive” in Afghanistan would be “diverted” by a tiny number of habeas

cases in the District court, where far fewer practical obstacles exist.  *Cf*. *Maqaleh*

*II*, 605 F.3d at 98 (quoting *Eisentrager*, 339 U.S. at 779).  Certainly, the evidence

is no longer “overwhelming” in this regard.  *Cf*. *Maqaleh II*, 605. 3d at 97.  Rather,

Respondents’ direct and active participation in over *1500* civilian trials so far at the

JCIP completely guts *any* credible argument that habeas review for these few

Petitioners would be "'impracticable or anomalous.'" *Cf. Boumediene*, 553 U.S. at

759-60.  By turning a blind eye to these changed circumstances, the District Court

erred substantially.

### B. The District Court's Factual Findings Concerning Bilateral Relations Were Erroneous

In *Maqaleh II*, the Court's holding that practical obstacles weighed heavily

in favor of Respondents was also premised on Respondents' representations that

Petitioners' detention within the sovereign territory of Afghanistan may itself

create practical difficulties. 605 F. 3d at 99.  In reaching its conclusion, the Court

recognized that on the record before it there was no indication that "that extending

our constitutional protections to the detainees would be in any way disruptive of

[the U.S.-Afghan] relationship," but that "neither [could it] say with certainty what

the reaction of the Afghan government would be."  *Id*.  But the record now

establishes that this Court need not be concerned about the potential reaction of the

Afghan government to extending the writ to Petitioners.

In their Amended Petitions, Petitioners averred that while plans for the

transfer of the Bagram prison facilities to Afghan control were underway, "the

Afghan government has never once publicly expressed interest in taking custody of

Petitioner[s] or any other non-Afghans unlawfully rendered to Afghanistan." *See,*

*e.g*., JA406 ¶137.  Petitioners submitted to the district court a *Times of London*

article dated July 9, 2012, which characterizes the reaction of one Afghan Member

20

of Parliament as "shocked to learn that detainees unrelated to the Afghan conflict were still being kept on Afghan soil."  The legislator is quoted as stating that when the prison was established in 2001, "Afghanistan was not a functioning state.  The Americans could do anything they liked.  But now we have a constitution and a legal system that forbids this sort of detention.  To keep prisoners for five, 10 or 20 years without evidence or a trial is ridiculous . . . They should either take them to Guantánamo or immediately give these prisoners access to a transparent legal process."  JA690.  At oral argument, the district court expressed doubt as to whether this statement made by a single government official as reported in the media was persuasive evidence of the Afghan government's position.  JA857, 80:10-80:16.

Petitioners' counsel subsequently sought a letter from the President of Afghanistan, in order to confirm the Afghan Government's official position regarding the Court's exercise of jurisdiction over Petitioners.  Petitioners' counsel were successful in obtaining a written confirmation from the Office of the President, dated September 19, 2012, signed by President Hamid Karzai's Chief of Staff himself, Mr. Abdul Karim Khurram ("Khurram Letter").  JA898. Respondents have never offered any contrary evidence of the Afghan government's position, nor do they even dispute the accuracy of Petitioners' characterization of it.  Instead, Respondents simply respond with an argument that

the Khurram Letter *may* not reflect the official position of the government of Afghanistan. *See* Response to Pet'rs' Supplemental Materials Filed on September 24, 2012 at 9-10, *Al Maqaleh v. Obama*, No. 06-1669 (D.D.C. Oct. 11, 2012), ECF No. 84-2. Whether Respondents like it or not, Karzai's Chief of Staff *did in fact* speak on behalf of the government of Afghanistan for the express purpose of assisting Petitioners' counsel in the instant litigation. But if, as Respondents insinuate, President Karzai's Chief of Staff were not authorized to make such representations, or somehow mischaracterized the official position of the Government of Afghanistan in relation to this matter, Respondents were free to present contradictory evidence. They did not. And, even if they had done so, the district court committed reversible error by failing to credit Petitioners' allegations as true.

Inexplicably, and apparently without thorough examination of the letter itself, the district court blindly adopted Respondents' unsupported and erroneous argument. The district court dismissed Petitioners' evidence of the official position of the Afghan Government based on Respondents' representations that "the Khurram Letter is a private letter to petitioners' counsel, does not indicate that Khurram is authorized to speak for the Afghan government, and arguably conflicts with contemporaneous public statements made by other Afghan officials." JA982. Each of these assertions is clearly wrong.

The Khurram letter is written on Afghan government letterhead.  It also bears the seal of the President of the Islamic Republic of Afghanistan.  And though Respondents' counsel claim that President Karzai's Chief of Staff might have lacked authority to speak on behalf of the government of Afghanistan, the Afghan government *itself* disagrees.  *See* Website for the Office of the President, Islamic Republic of Afghanistan, *available at*: http://president.gov.af/en/page/1051 (stating that the Chief of Staff directly supervises the presidential Media Directorate / Office of the Spokesperson).

The Khurram letter states in no uncertain terms that it conveys "a confirmation of the Afghan Government position."  In the first paragraph, Mr. Khurram explicitly thanks Petitioners' counsel for "visiting my office to describe the actions of the International Justice Network on behalf of foreign nations [sic]whom the U.S. Government has held in Bagram" (*i.e.* representing them through habeas petitions filed in U.S. courts).  Moreover, Mr. Khurram clearly contemplated that the letter was being sought as evidence in the instant litigation: "I hope the confirmation of the Afghan Government position will allow you to pursue your efforts on behalf of Mr. Amin al-Bakri."  Mr. Khurram makes explicit exactly what Petitioners' counsel asked him to clarify: that *the position of the Government of Afghanistan* is that it favors "access to a fair judicial process and adjudication by a competent court" for the claims of third-country nationals

23

"caught outside of Afghanistan and brought to Bagram." JA899. If the government of Afghanistan were in any way opposed to the district court's exercise of jurisdiction over these Petitioners, President Karzai's office simply would not have written and delivered an official letter to Petitioners' counsel making contrary assertions.

Respondents feebly counter the Khurram Letter with a single quote that appeared in a newspaper article that predates Mr. Khurram's letter. JA956. The district court erred in relying on this article because it does not even purport to address the same issue as the Khurram Letter. The Khurram Letter spells out the Afghan government's position concerning TCNs "*caught outside of Afghanistan and brought to Bagram*." JA898 (emphasis added). By contrast, the official quoted in the news article merely stated that "[w]hen it comes to third-country nationals, that will be a matter we decide with our international partners at some point down the road." JA956. This reference to TCNs *in general* at most supports the possibility that the government of Afghanistan *may* have an interest in foreign detainees apprehended *within its borders*; but the opposite is necessarily true with respect to TCNs apprehended *by the U.S. outside of Afghanistan*. Mr. Khurram's letter explains the government of Afghanistan's rationale for this distinction.

> "*Over the past decade there have been media reports that, in the immediate months following 9/11 and within the context of its War on Terror, the United States hunted and caught individuals whom it considered a threat to its national security.*

24

> *The Government of Afghanistan was never been [sic] informed of the transfer and imprisonment of these individuals. We are unaware of the number of foreign nationals caught outside Afghanistan and brought to Bagram. We have no desire for them to remain on our territory. Furthermore, the Government of Afghanistan favors these individual [sic] having access to a fair judicial process and adjudication of their case by a competent court.*" JA899.

The Khurram letter is entirely consistent with Petitioners' allegations of rendition – *see, e.g.*, JA1114 ¶¶14-17 – as well as all other evidence in the record concerning the Afghan government's position regarding TCNs *who were forcibly brought to Afghanistan by the United States. See, e.g.*, JA690. The district court's conclusion to the contrary was clearly erroneous.

Taken together, Petitioners' new evidence resoundingly establishes that the practical obstacles at Bagram today are not, in fact, sufficient to render habeas review for these Petitioners "impracticable or anomalous." *Cf. Boumediene*, 553 U.S. at 759-60.

## II. The Citizenship, Status, and Adequacy of Process Prong of the *Boumediene* Analysis Now Weighs Decisively in Petitioners' Favor

In *Maqaleh II*, this Court held that the citizenship, status, and adequacy of process prong of the *Boumediene* test favored Petitioners. With respect to citizenship, the Court held that Petitioners "differ in no material respect from the petitioners at Guantánamo who prevailed in *Boumediene*." *Maqaleh II*, 605 F.3d at

at 96. The evidence regarding Petitioners' citizenship has not since changed, and thus still weighs equally in favor of Petitioners.[2]

As to status, the Court of Appeals similarly found that "the status of the petitioners before us again is the same as the Guantánamo detainees, so this factor supports their argument for the extension of the availability of the writ." *Maqaleh II*, 605 F.3d at 96. Thus, this Court previously held that status was already a factor which weighed in Petitioners' favor. The evidence in the record now reflects new information about Petitioners' status that demonstrates that Petitioners' status weighs much *more* heavily in their favor than it did before.

Finally, this Court previously held that the adequacy of the process through which Petitioners' status determinations were made weighed against Respondents. Maqaleh II, 605 F.3d at 96. In considering the new evidence submitted by Respondents regarding the establishment of DRBs at Bagram, the district court in

---

[2] In its citizenship analysis, the Court of Appeals appears to rely on a binary distinction between U.S. citizens and noncitizens. *Maqaleh II*, 605 F.3d at 95-96. Petitioners, however, have consistently argued that the case law supports an additional distinction, which should be applied to citizens of countries who are not involved in any hostilities against the United States. *See Boumediene*, 553 U.S. at 734 (noting that no petitioner was a "citizen of a nation now at war with the United States"); *Rasul v. Bush*, 542 U.S. 466, 476 (2004) (noting that petitioners were "not nationals of countries at war with the United States"); *see also Eisentrager*, 339 U.S. at 769 n.2 (defining an alien enemy as "the subject of a foreign state at war with the United States"). Petitioners are citizens of Yemen and Tunisia, and neither country is at war with the United States.

26

*Maqaleh III* concluded that the establishment of DRBs at Bagram bolstered Respondents' arguments regarding adequacy of process. JA991. But the district court's factual findings in support of this conclusion were clearly erroneous, and were improperly based only on the DRB procedures as written, rather than the adequacy of the process *actually received by Petitioners. See id.*

### A. Petitioners' Status Now Weighs Even More Heavily in their Favor

In *Boumediene*, the Court held that the Guantánamo detainees' status differed from the petitioners in *Eisentrager*, who did not contest their status as "enemy aliens." But here, Petitioners not only contest that they are "enemies" of the United States, but have also averred that Respondents have cleared them for release from Bagram. Petitioners have submitted undisputed evidence in support of these allegations. Apparently, Respondents themselves no longer deem Petitioners internment as "necessary." *See, e.g.*, JA552-87; JA683; *cf.* JA467 ¶12.

On the one hand, Respondents maintain that "the United States has no interest in holding detainees longer than necessary," and they define "necessity" in connection with the ongoing and indefinite war on terror. JA466 ¶10. But on the other hand, they insist that their own determination that it is no longer "necessary" to detain a particular individual as an enemy in the war on terror is irrelevant. JA850, 73:14-73:19. What this amounts to is Respondents' unilateral elimination of the status prong of *Boumediene*, in which the Supreme Court plainly held that

27

consideration of a petitioners' status, and the adequacy of process through which status is determined, is not only relevant but *intrinsic* to the jurisdictional analysis. 553 U.S. at 766-67.

At oral argument, the district court clarified that Respondents have never disputed Petitioners' allegations that they have been cleared for release.

> THE COURT: Correct me if I'm wrong: Has the government said what has happened with respect to those determinations?
> MS. LIN: The --
> THE COURT: [Petitioners] have alleged that they have been cleared at that point in the process. Has the government said yes or no with respect to that?
> MS. LIN: No, we have not. We have not, Your Honor.

JA848-49, 71:19-72:01.

Instead, Respondents have urged an understanding of "status" that is unsupported by *Boumediene* and narrowly limited to the issue of "detainability." Respondents would have this Court ignore DRB determinations about whether Petitioners' continued detention is "necessary." JA850, 73:14-73:19. But under *Boumediene* this Court cannot do so.

When *Boumediene* was before the Supreme Court, Respondents used two separate processes to assess the detention of prisoners in their custody at Guantanamo: the CSRTs and the ARBs. The CSRTs determined if a prisoner "met the criteria for internment." JA338. And the ARBs determined whether a prisoner's continued internment was "necessary." JA69. To be sure, the

28

*Boumediene* opinion only discusses the CSRTs – but that is simply because, as a *factual* matter, there was no evidence on the record before the Court to suggest that the *Boumediene* petitioners had yet been *subjected* to ARBs. This Court, by contrast, has ample evidence before it that, through the DRBs, Respondents have repeatedly assessed Petitioners' "detainability" *as part of the same DRB proceedings* in which they have assessed the "necessity" of their continued internment. *See* JA474 ¶12. Because both sets of determinations form the basis for Respondents' continued detention of Petitioners, both determinations *necessarily* trigger the bedrock separation of powers concerns that are so unique to habeas jurisdiction and that define *Boumediene*.

Respondents' reliance on this Court's decisions in *Almerfedi v. Obama*, 654 F.3d 1, 4 n.3 (D.C. Cir. 2011), and *Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010), is completely inapposite. In those cases, this Court determined that Respondents' clearance for release of a Guantanamo prisoner is irrelevant to the *merits* question of whether Respondents have the authority to lawfully detain him. Here, Petitioners are not arguing that the clearance determinations entitle them to release. They are arguing that the Executive cannot pick and choose from among the determinations which they have made in presenting the facts to this court. At this stage of the proceedings, the Court has an obligation, based on the separation of powers concerns expressed in *Boumediene*, to examine the entirety of the

process and determinations that have been made by Respondents to justify Petitioners' continued detention at Bagram. Consequently, the district court clearly erred by adopting Respondents' reliance on *Awad* and *Almerfedi* and by otherwise failing to consider Respondents' determinations clearing Petitioners for release in the analysis of status required by *Boumediene*.

## B. The Adequacy of Process Factor Still Weighs Heavily in Petitioners' Favor

On the eve of oral argument in *Maqaleh II*, Respondents submitted new procedures to this Court in an attempt to bolster their argument that the process for evaluating Petitioners' status was no longer woefully inadequate. This Court declined to consider those procedures, and instead based its analysis on the *actual procedures that were used* to determine Petitioners' status. *See* 605 F. 3d at 96 n. 4.

### 1. The DRB Procedures Still Fall Short of the CSRTs That Were Deemed Inadequate in *Boumediene*

Respondents argue that the new DRB procedures are a marked improvement over the UECRBs. See Resp'ts' MTD at 20-23. But the DRBs do nothing to address the fundamental flaws of the UECRB procedures, which this Court previously held were inadequate. *Maqaleh II*, 605 F.3d at 96.

Respondents would have this Court defer to the DRB panel's unreviewable and unilateral decision that a particular detainee is "lawfully" detained. But the

members of the DRB panel are not even attorneys, much less trained in the complex law and precedents regarding whether an individual may be lawfully detained under the AUMF. Not only do the panel members have no legal training or experience, their decision many not be appealed to any higher authority, much less subject to judicial review. Pet'rs' Opp'n to Resp'ts' Mot. to Dismiss Am. Pets. for Writs of Habeas Corpus at 12-21, *Al Maqaleh v. Obama*, No. 06-1669 (D.D.C. June 24, 2011), ECF No. 65 ("Pet'rs' Opp'n). Even the CSRTs, which the court in *Boumediene* held were wholly inadequate, provided Petitioners with the opportunity to appeal their status determinations to an Article III court.

Like its predecessor, the UECRB, the DRB denies Petitioners access to counsel. Pet'rs' Opp'n at 14-18. Respondents' claim that the addition of "personal representatives" is an improvement over the UECRBs. Resp'ts' MTD at 21. But, as the court in *Boumediene* took note, this fact does nothing to remedy the inherent problems with lack of counsel access. *Boumediene*, 553 U.S. at 767. Personal representatives are not attorneys, have no legal training, and are not bound by attorney-client privilege or any duty of confidentiality, zealous advocacy, or loyalty to the detainee. Though personal representatives are charged with representing "the best interests" of the detainees, this cannot substitute for the duty of zealous advocacy to which attorneys are bound. Moreover, personal representatives are subject to an unenforceable non-disclosure policy which falls

31

far short of an attorney's duty of confidentiality. Pet'rs' Opp'n at 15. The detainees themselves are often conflicted about whether or not to even confide in the personal representatives. Pet'rs' Opp'n at 16.

Petitioners do not merely rely on argument to support these claims, but have submitted compelling evidence that the personal representatives are unable to provide detainees with the level of representation that could be offered by competent legal counsel. JA545. Personal representatives themselves are limited by the resources, preparation and support provided to them – they are often given no more than 30 days to prepare – an extremely limited amount of time to develop trust and rapport with the detainee, review his file, meet with him, investigate the case, confer with witnesses, and prepare his/her presentation to the DRB. Pet'rs' Opp'n at 16. Even those personal representatives who go above and beyond the call of duty to try to assist a detainee often find that their chain of command does not support their efforts. JA910-944.

Respondents insist that the DRB scheme is subject to "checks and balances" consistent with "our Constitutional system." Resp'ts' MTD at 19. But the status determinations of the DRBs are unilateral executive decisions, which do nothing more than make "recommendations." JA500-502. Even if a DRB clears a detainee for release, Respondents are free to disregard that recommendation entirely, as they have in these cases. *See, e.g.*, JA589; JA710. And, even if the DRBs provided

32

much more robust procedural protections in reaching their status determinations, those determinations are ultimately meaningless, and may be disregarded by Respondents.

### 2. Petitioners' DRBs Were Procedurally Inadequate

While Respondents have disclosed a portion of their policies for implementing the DRBs, they have never disclosed the details of whether and how that policy has been applied to these Petitioners.  The district court acknowledged that Respondents were selectively revealing information about Petitioners' status determinations.  JA849-850, 72:02-73:13.  Nonetheless, it erred by failing to draw all factual inferences in favor of Petitioners.  *See Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (In the absence of contrary evidence, the court must accept all allegations as true and draw all reasonable inferences in the plaintiff's favor).

Respondents claim their arguments concerning adequacy of process are bolstered by the establishment of improved procedures at Bagram, but fail to reveal crucial details regarding whether Petitioners were *in fact* afforded the additional procedural "rights" to which they are now supposedly entitled.  Whether or not the procedures mark any incremental improvement to the UECRBs on paper, the fact remains that Petitioners have presented evidence that they have been denied the benefit of even these incremental modifications.

33

Even in the absence of any jurisdictional discovery related to the application of the new DRB procedures to their individual cases, Petitioners have produced compelling evidence that the procedures used by Respondents to determine status are woefully inadequate. For example, even though the DRB procedures provide that Petitioners shall be afforded the opportunity to call reasonably available witnesses, Petitioners have *in fact* been denied that opportunity. JA910-945. Respondents claim that more than 1,792 witnesses were called to testify in-person and an additional 425 testified via telephone at DRBs held between March 2010 and May 2011. Resp'ts' MTD at 22. But Petitioners have not been allowed to call any in-person witnesses at their DRB proceedings. JA910-945. Moreover, the DRB procedures also expressly state a preference in favor of live witnesses over telephonic. *See* JA499 ("In order to provide complete and credible information to the DRB *live witnesses are preferred where possible*; VTC is the next option to be considered, then telephone or video tape, sworn statements, and unsworn statements.") (emphasis added). But as the undisputed evidence in the record reflects, Respondents have declined to follow their own policies with respect to Petitioners.

Through their Personal Representatives, Petitioners' had requested specific live witnesses to appear at their September 2012 DRBs. JA910 ¶11. Moreover, their personal representatives had received approval from DOD personnel at the

34

Detainee Assistance Center for the witnesses to appear in person. JA910 ¶16. Nevertheless, at the eleventh hour, and without explanation, Respondents arbitrarily prevented those witnesses from appearing to testify at Petitioners DRBs. JA910 ¶¶ 19-23.

Most glaringly, the inadequacy of the DRB procedures as applied to Petitioners is illustrated by the fact that each Petitioner has been determined to be cleared for release by a DRB, but those determinations are entirely meaningless. Petitioners Maqaleh and Bakri have presented evidence that each of them has been recommended for release on multiple occasions, and that their home governments are seeking their return. JA693-707; JA726-741. Respondents have ignored these determinations.

## III.   The Nature of the Site of Detention Now Weighs in Favor of Petitioners

### A. The District Court Erred in Relying on Respondents' Unsupported Representations that the US Does Not Intend to Create a Permanent Detention Facility at Bagram

In *Maqaleh II*, this Court acknowledged that just as at Guantánamo, the Bagram lease agreement grants the United States the option to remain at Bagram indefinitely.  605 F.3d at 97.  However, it distinguished Bagram from Guantánamo

based on a finding that "there is no indication of any intent to occupy the base with permanence."[3] *Id*.

In their briefs in *Maqaleh II*, Respondents' counsel represented that the United States intended to vacate Bagram as soon as Respondents determine that the facility "is no longer needed for military purposes."  Br. for Resp'ts-Appellants at 34, *Al Maqaleh v. Gates*, No. 09-5265 (D.C. Cir. Sep. 14, 2009), Doc. No. 1206197.

While Respondents intended (and did) transfer the newly-built Detention Facility in Parwan ("DFIP") to the Afghan government, they have now evinced a desire to continue to operate a separate detention facility at Bagram in which to house Petitioners based solely on authority derived from the AUMF.  *See* JA320; JA323; JA465 ¶¶ 6-8; JA688.  Such authority under the AUMF will last indefinitely, and likely for decades beyond the end of U.S. military operations in Afghanistan, if not permanently.  And, though Respondents may be entirely "sincere" in their desire to close the Bagram facility in which Petitioners are held as soon as possible – *cf*. JA980 – similar promises by the Executive to close the

---

[3] It should be noted here that the Supreme Court did not characterize the US government's intentions to occupy Guantanamo as permanent.  "Unlike its present control over the naval station [at Guantanamo], the United States' control over the prison in Germany was neither absolute nor indefinite."  Boumediene, 553 U.S. at 768. Petitioners maintain that it is the indefinite occupation of Bagram that is the operative distinction for the purposes of the jurisdictional analysis.

Guantánamo prison have proven to be an unreliable predictor of whether or not such facilities will remain "permanent" US facilities or not.

In *Maqaleh III*, the district court found that Respondents' initiation of transfers of Afghan prisoners back to Afghan control was an indication of Respondents "sincerity" that they did not intend to occupy the base with permanence. But the district court's conclusion was illogical. As US participation in the military conflict in Afghanistan draws to a close, the transfer of individuals detained *as part of the military conflict in Afghanistan* would necessarily follow. However, the opposite is true for third country nationals who are not detained as part of the Afghan conflict at all, but who may be detained solely pursuant to the AUMF. Indeed, even prior to the filing of the Amended Petitions, Respondents had admitted that they would likely retain custody of some third country nationals even after the completion of the transfer of the DFIP. At the time when *Maqaleh II* was decided, the possibility remained that Respondents could choose not to continue to operate a detention facility at Bagram beyond the cessation of the conflict in Afghanistan. But at present, Respondents' failure to transfer detainees who were not slated for transfer to the Afghan government to other locations -- whether to their home countries, Guantánamo, or anywhere else *other than* Afghanistan, is simply inconsistent with a desire not to establish a permanent detention facility at Bagram.

37

Petitioners first averred that the US Government planned to retain control of a detention facility *at Bagram* to continue to hold third country nationals rendered to Afghanistan in their Amended Petitions. *See, e.g.*, JA1114 ¶118.  In the Affidavit of William K. Leitzau, filed with their motion to dismiss the Petitions, Respondents conceded that they were building a separate prison facility at Bagram in which they would continue to hold non-Afghan detainees in their exclusive custody even after the intended transfer of the DFIP to the Government of Afghanistan. *See* JA202 ¶6.   In their opposition to Respondent's Motion to Dismiss and subsequent filings, Petitioners cited numerous media reports that suggested that Petitioners themselves would continue to be indefinitely detained at a secret facility within the exclusive custody and control of US authorities at Bagram well after the transfer of the DFIP to Afghan contol.

On March 9, 2012, the US and Afghan governments entered into a Memorandum of Understanding regarding the transfer of detention facilities at Bagram to Afghan control. JA678.  The MOU contemplates that the transfer of Bagram prison facilities to Afghan control was to be completed by September 9, 2012.   However, the US government subsequently entered into an "Enduring Strategic Partnership Agreement" with the government of Afghanistan which contemplates that the US will maintain a military presence in Afghanistan through *at least* 2024.  JA744.  Since Respondents will continue to maintain a military

38

presence in Afghanistan for at least another decade, and they assert the authority to detain Petitioners beyond the end of hostilities in Afghanistan, Petitioners are likely to remain at Bagram long after the Afghan conflict is over. Indeed, Respondents have qualified their plans to vacate Bagram as follows: "the United States does not intend to continue to use the DFIP to detain any person pursuant to the AUMF, as informed by the law of war, *beyond the cessation of hostilities with the Taliban, al Qaida, and associated forces*." JA202 (emphasis added).

While the Executive has indicated that there is an end in sight to the conflict with the Taliban in Afghanistan, it has never suggested that it may someday declare an end to the war with "al Qaida, and associated forces." JA831-833. As part of the effort to wind-down US participation in the conflict in Afghanistan, the US government has transferred the vast majority of Bagram detainees to the government of Afghanistan. In contrast, it defies logic to suggest that Petitioners will be released upon "the cessation of hostilities," when the global conflict with "Al Qaeda, and associate forces" may never formally end.

B. **A Feature of the Site of Detention Which is Unique to the Bagram and Guantanamo Military Bases Is that Detainees Are Held Pursuant to the AUMF, Rather than the Laws of War.**

This Court expressed concern that extension of the writ to Bagram would create worldwide jurisdiction over every US military base abroad in which the US holds detainees in their exclusive custody and control. But a limiting principle that

distinguishes Guantanamo and Bagram from all other military bases abroad is that the Executive asserts authority under the AUMF, rather than relying solely on the laws of war, to detain individuals at those two sites.

Other U.S. military bases abroad may operate detention facilities during armed conflicts to hold battlefield captures – *i.e.* prisoners of war and other traditional law-of-war internees.  Thus, to the extent that the DFIP is being used to hold combatants who participated in the conflict in Afghanistan, it is simply incidental to the ongoing hostilities in that country.  However, the laws of war do not authorize the detention of individuals who are not citizens of a nation at war with the United States, nor do they authorize the detention of enemy fighters beyond the conflict in which they were detained.  Thus, Petitioners, like the detainees at Guantanamo, cannot continue to be lawfully detained absent the authority claimed by the Executive pursuant to the AUMF.  It is this unique authority, which permits the Executive to indefinitely detain an individual based on nothing more than an unreviewable representation that he is an enemy of the state, that gives rise to the separation-of-powers concerns expressed in *Boumediene*.

C. **The District Court erroneously concluded that Petitioners evidence of evasion was irrelevant to the *Boumediene* analysis.**

In *Maqaleh III*, Petitioners included specific allegations in their Amended Petitions that their transfer from third countries to Bagram was motivated by a desire to evade judicial review.  The District court erred in failing to consider how

40

these new allegations impacted the jurisdictional analysis.  In *Maqaleh II*, this Court was careful to note that it "[did] not ignore the arguments of the detainees that the United States chose the place of detention and might be able 'to evade judicial review . . . .'  [T]he Supreme Court did not dictate that the three enumerated [*Boumediene*] factors are exhaustive.  It only told us that 'at *least* three factors are relevant' . . . . Perhaps such manipulation by the Executive might constitute an additional factor."  605 F.3d at 98-99.  The District court failed to consider impact of the fact of manipulation of the site of detention on the jurisdictional analysis.  The additional factor weighs heavily in Petitioners' favor.

Petitioners' Amended Petitions allege that they were brought to Bagram by Respondents in an attempt to manipulate their site of detention to avoid judicial scrutiny.  *See, e.g.*, JA1114 ¶¶89-102; Pet'rs' Reply in Supp. of Their Mot. To Am. at 7-12, *Al Maqaleh v. Obama*, No. 06-1669 (D.D.C. Nov. 12, 2010); Pet'rs' Opp'n at 28-33.  And, Petitioners argue that Respondents' evasion of judicial review did not end with the initial rendition of Petitioners to Afghanistan, it endures in their ongoing and open-ended imprisonment of Petitioners at Bagram.

Respondents have offered no contrary facts in response to Petitioners' specific allegations of evasion.  This is particularly significant "in light of the unavailability of" Petitioners themselves and the fact that "the location of most of the remainder of the information regarding [Petitioners'] detention is in the hands

41

of the United States or [other] governments." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 64 (D.D.C. 2004); *see also Campbell v. United States*, 365 U.S. 85, 96 (1961) (stating that burden of proof cannot be placed "upon a litigant of establishing facts peculiarly within the knowledge of his adversary").

Respondents provide absolutely no explanation for the initial decision to take Petitioners from their initial sites of apprehension to Bagram, nor do they offer any rationale for continuing to keep them at Bagram. Instead, Respondents merely suggest that there *may* have been reasons other than evasion of judicial review which brought them to Bagram. The fact of the matter is that if Respondents' wanted to dispute Petitioners' new allegations of evasion, they could have easily provided a short affidavit, either unclassified or classified, from an official with knowledge. Indeed, Respondents have voluntarily submitted more than a dozen declarations by military personnel and government officials since these cases were originally filed. See Pet'rs' Opp'n at 36. Here, they chose to remain silent. The District court erred in failing to accept the new allegations in the amended petitions as true in the absence of any evidence to the contrary.

On the basis of the record before it, the Court of Appeals in *Maqaleh II* expressed a reservation that the "decision to 'turn off the Constitution' would have required . . . officials making the situs determination to anticipate the complex litigation history [over habeas jurisdiction] and predict the *Boumediene* decision

42

long before it came down." *Al Maqaleh*, 605 F.3d at 99. In their Amended Petitions and subsequent briefing however, Petitioners demonstrate that, in fact, Respondents originally brought and kept detainees at Guantánamo, and have brought and kept these Petitioners at Bagram, based on legal advice that habeas jurisdiction would likely not extend to them at those sites. *See, e.g.*, JA1114 ¶¶89-102; JA603-677; Pet'rs' Reply in Supp. of Mot. for Leave to File Supplemental Materials at 8, *Al Maqaleh*, No. 06-1699 (D.D.C. Sep. 6, 2011). Glaringly, Respondents do not rebut this basic premise anywhere in the record below.

In stark contrast to Respondents' silence on the matter, Petitioners have presented a sworn Affidavit from former Secretary of State Colin Powell's Chief of Staff, Colonel Lawrence B. Wilkerson (Ret.). JA900. Col. Wilkerson's Affidavit demonstrates that not only was evasion of judicial review a possible reason why Petitioners were taken to Bagram, but that it was the policy and practice of the US government to transfer AUMF detainees to sites where the jurisdiction of the US courts was not yet established. Col. Wilkerson states that as early as August 2002, he "understood that the deliberate choice to transfer detainees captured in third countries to Guantánamo and Bagram, along with the subsequent and continuing decision to keep those detainees there, was often motivated in significant part by a desire to place detainees outside the jurisdiction of any legal system—in particular United States courts." JA903.

43

Colonel Wilkerson's account of US government policy of evasion of judicial review is also echoed by the sworn statement of Glen Carle, Deputy National Intelligence Officer Director for Transnational Threats at the U.S. Central Intelligence Agency from 2003-2005. JA907. Mr. Carle was also intimately familiar with the transfer and interrogation of another "high-value" detainee who was apprehended in Dubai in 2002, and subsequently taken to Bagram (via Morocco). JA589. Like Colonel Wilkerson, Mr. Carle concludes that since Petitioners were taken to Bagram during the same time period, the decision to house them at Bagram was motivated in part by a desire to avoid judicial review.

That Respondents' continuing decision to keep Petitioners at Bagram has been driven by a desire to evade judicial review is further evinced by the fact that overall prisoner transfers from Bagram to Guantánamo fell dramatically in the wake of *Rasul* and *Hamdi*. Where Respondents pointedly refuse to confirm or deny "whether the number of transfers actually fell," a military attorney with some exposure to the matter stated outright that the number of transfers fell *as a matter of policy*. JA277. Additionally, Petitioners now know that between 2001 and 2004 no less than twenty-five communications involving the Office of Legal Counsel pertained to the transfer of detainees and prisoners. JA238. And between 2002 and 2004 no less than twenty communications involving the Office of Legal Counsel pertained to habeas jurisdiction and/or litigation. JA238. At the very least,

Respondents' advisors in the Office of Legal Counsel were deliberating the issues of prisoner transfer and habeas jurisdiction as the "complex litigation history" alluded to by the Court of Appeals was unfolding.  JA228.

The history of prisoner transfers from Guantánamo in response to *Rasul* and *Hamdi* further corroborates Petitioners' assertion of ongoing evasion in this case. In response, Respondents point to the transfer of ten detainees from Afghanistan to Guantánamo in the months after *Rasul*.  However, the circumstances underlying this transfer are entirely unclear.  Moreover this "counterexample" misses the point.  The point is not that the U.S. government was no longer transferring people to Guantánamo in the absolute, but that the government was selectively choosing whom to transfer and declining to transfer to Guantánamo those for whom it did not wish to risk habeas review.  Judicial scrutiny may have been an acceptable risk with respect to the ten detainees referenced by Respondents.  However, the risk of scrutiny was clearly not acceptable to the government with respect to the CIA captives transferred from Guantánamo in the weeks before *Rasul*.   And the risk of scrutiny has clearly not been acceptable to Respondents with respect to Petitioners, each of whom was secretly sent to one or more prisons and/or CIA "black sites" before being rendered to Bagram.

45

**CONCLUSION**

   For the foregoing reasons, the decision of the district court should be reversed and remanded.

Dated:  April 26, 2013

Respectfully submitted,

___/s/_Tina M. Foster_____     ___/s/_Ramzi Kassem_____
TINA MONSHIPOUR FOSTER           PROF. RAMZI KASSEM
GOLNAZ FAKHIMI                   MARLOWE BOETTCHER*
 **International Justice Network**   ELIZABETH ROSSOW*
5500 Ridge Road West             **Main Street Legal Services, Inc.**
Spencerport, NY 14559            City University of New York School of
(718) 717-8467                   Law
*Counsel for Petitioners Fadi Al-Maqaleh,*   2 Court Square
*Amin Al-Bakri and Redha Al-Najar*   Long Island City, NY 11101
                                 (718) 340-4558
___/s/_Sylvia Royce_____     *Law Student Interns*
SYLVIA ROYCE
**Law Office of Sylvia Royce**       ___/s/_Hope Metcalf_____
3509 Connecticut Avenue, NW #1176   PROF. HOPE METCALF
Washington, DC  20008            National Litigation Project
(202) 362-3445                   Lowenstein Int'l Human Rights Clinic
                                 **Yale Law School**
*Counsel for Petitioner Redha Al Najar*   127 Wall Street
                                 New Haven, CT 06511
                                 (203) 432-0138
                                 *Counsel for Petitioner Amin Al-Bakri*

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C) and D.C. Circuit Rule 32(a), that the foregoing brief is proportionally spaced, has a typeface of 14-point Times New Roman Font, and contains 9,951 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(i).


_____/s/_____
Tina M. Foster
Counsel for Appellants

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2013, I caused a true and accurate copy of Joint Brief for Petitioners-Appellants to be served upon the following counsel for Respondents-Appellees via electronic mail, by operation of the Court's ECF system, and via first class mail:

Sharon Swingle
Appeals Counsel
Civil Division, Appellate Staff
**U.S. Department of Justice**
950 Pennsylvania Ave., N.W., Rm. 7250
Washington, D.C. 20530-0001
(202) 353-2689

_____/s/_____
Tina M. Foster
Counsel for Appellants